J. W. EVANS, Respondent, *v.* ST. LOUIS, IRON MOUNTAIN AND SOUTHERN RAILWAY COMPANY, Appellant.

### February 28, 1882.

1. A contract between a carrier and a passenger will, when open to construction, be so construed as to save a right and prevent a forfeiture.
2. The holder of a railway ticket, by the terms of which he agrees to "use the same on or before the expiration" of a day named, complies with the terms of that limitation where he enters upon the transit before midnight of the day named.
3. Exemplary damages may be allowed where the act of the carrier in unlawfully ejecting the passenger from the train is wanton, reckless, and oppressive.
4. Where a passenger is unlawfully put off the train at a flag station at midnight, in a wintry storm, a great distance from his starting point and his destination, and, in endeavoring to walk to the next station, falls through a cattle-guard and is injured, it is proper to submit to the jury the questions as to whether the injury was the proximate consequence of the wrong done in putting the passenger off the train, and as to whether the conduct of the conductor in putting him off was wanton, reckless, and oppressive.

APPEAL from the St. Louis Circuit Court, HORNER, J. *Affirmed.*

BENNETT PIKE, for the appellant: A time may be limited upon a ticket, after which it is of no value; and where a ticket expires of a certain date, if a passenger refuse to pay the regular fare upon request, he may be ejected. — *Boston* v. *Proctor*, 1 Allen, 267; *Ripley* v. *Railroad Co.*, 31 N. J. L. 388; *Hill* v. *Railroad Co.*, 63 N. Y. 101; *Sherman* v. *Railroad Co.*, 40 Iowa, 45; *Lillis* v. *Railroad Co.*, 64 Mo. 464; *Brown* v. *Railroad Co.*, 64 Mo. 536. There is in this case no evidence of a wanton, reckless, or oppressive action on the part of the conductor Webb towards the plaintiff. If any wrong was done, it was simply an error of judgment in construing the ticket and in ejecting Evans from the train. All the testimony shows that there was no resistance made, but merely a walking

out by Evans on to the platform. If damaged, what then is the measure of his damages? Clearly those immediately arising from his expulsion. — 2 Redf. on Rys. (5th ed.) 297; *Brown v. Railroad Co.*, 64 Mo. 536; *Graham v. Railroad Co.*, 66 Mo. 536; *Pullman Palace Car Co. v. Reed*, 75 Ill. 125; *Milwaukee R. Co. v. Ames*, 91 U. S. 489.

W. C. HOBBS, for the respondent: "Where malice, violence, oppression, or wanton recklessness mingle in the controversy, vindictive damages may be awarded." — *Hicks v. Railroad Co.*, 68 Mo. 329. The question, whether the unlawful putting off of the passenger is the proximate cause of the injury, is for the jury. — *Clemens v. Railroad Co.*, 53 Mo. 366.

THOMPSON, J., delivered the opinion of the court.

The plaintiff recovered a judgment against the defendant for $250 damages for ejecting him from one of its passenger trains. It appears that on the twenty-sixth day of February, 1881, he purchased of a ticket broker at the Union Depot, in St. Louis, an emigrant ticket from St. Louis to Little Rock, which had been originally issued by the Ohio and Mississippi Railroad Company on account of the defendant. This ticket contained the following clause: "The holder hereof, in consideration of the reduced rates at which this ticket is sold, agrees with the respective companies over whose roads such holder is to be carried, to use the same on or before the expiration of date as cancelled by punch on the margin of this contract, and the holder hereof failing to comply with this agreement, either of said companies may refuse to accept this ticket, or any coupons thereof, and demand the full, regular fare, which the holder agrees to pay. If more than one date is cancelled it will not be received for passage by conductors." On the margin of this ticket the printed words and figures, "Feb." "26," and "1881," were punched out with a punch which

cut a hole through the ticket in the form of a letter L; so that the last day on which the ticket could be used under its terms, was February 26, 1881.

With this ticket in his possession the plaintiff went aboard the regular passenger train of the defendant at the Union Depot in St. Louis, at nine o'clock, P. M., on the day named, February 26, 1881. The testimony is conflicting as to whether his ticket was inspected by any servant of the defendant before the train started. The conductor and a porter of the train testify that it was; and that the conductor told him that it would only be good until midnight, and that he had better go back to the office where he bought it and get it changed. He and a person who went with him to see him off, testify that his ticket was not called for before the train started. Then (with some conflict), the substantial testimony is that after the train had got out of St. Louis, the conductor inspected his ticket and told him that it would not be good after midnight, and that he could not ride beyond Bismark without paying additional fare; that, after some negotiation, by which the plaintiff endeavored to induce the conductor to carry him through to Little Rock, he was put off at a station between midnight and two o'clock in the morning. The conductor and the porter swear that this station was Iron Mountain, a town of five hundred or six hundred inhabitants, where, the conductor swears, *he* could have got accommodation for the night. The plaintiff, on the other hand, swears that it was at a flag station about a mile and a half north of Arcadia, where there were no houses in sight, no lights visible; and that he was told by a man at the station that if he should go on to Arcadia he would find a fire and a telegraph operator at the station-house, and that they would let him stay there. So, as he testifies, he went on, following the railroad track. It was very dark, and rained heavily. He could see nothing except by the flashes of lightning. While thus groping his way along, he fell through a cattle-guard and hurt his knee. He arrived

at Arcadia drenched with rain, and found shelter there.
The rain turned to snow before morning.   He caught a bad
cold.   His knee swelled badly.   A doctor prescribed for
him at Arcadia the next day, but only charged him twenty-
five cents for the medicine which he gave him.   He also
paid twenty-five cents for his dinner at Arcadia.   He got
back to St. Louis at an additional cost of $2.65 ; was laid
up with the cold and his knee for about six weeks.   The
physician who prescribed for him in St. Louis, testifies that
his knee-cap was injured, though not broken, and that the
injury, though not serious, is liable to cause him future
trouble.

The testimony as to his falling through the cattle-guard
was admitted against the defendant's objection, and an ex-
ception was saved.

The court, at the request of the plaintiff, gave the follow-
ing instructions to the jury : —

" 1.  Upon the contract upon the ticket read in evidence,
the court declares the law to be, that if the holder of said
ticket, on the twenty-sixth day of February, 1881, went
upon defendant's passenger train at St. Louis, for the pur-
pose of being carried to Little Rock, Arkansas, to which
place the said train was about to proceed, and on said date,
and before its expiration, offered said ticket to defendant's
conductor when called upon by him for his fare; then it
was the duty of said conductor to receive said ticket and
to carry him on said train to Little Rock.   And if the jury
believe from the evidence that the plaintiff had purchased
said ticket and was the holder thereof, and if, upon said
twenty-sixth day of February, after getting upon defend-
ant's passenger train on its way to Little Rock from St.
Louis, offered said ticket to defendant's conductor on said
date, and before its expiration, and if the jury find that
said conductor refused to receive said ticket and refused to
permit the plaintiff to be carried by said train to Little Rock,
Arkansas, his destination aforesaid, but required and com-

pelled him to leave said train before reaching said place, the defendant is liable in this action, and your verdict should be for the plaintiff.

" 2. If you find for the plaintiff, you should award him such a sum in damages, as will compensate him for the injury done him in consequence of the defendant's wrongful act; and the court instructs the jury that, in arriving at such sum, the jury may consider plaintiff's loss of time, if any has been proven; his inability to attend to business and to work, if the same is established by the proof; all pecuniary expenses established by the evidence, if such you find has been done; all bodily pain and mental anguish which the evidence shows to have been the immediate result of such wrongful act. And the court further instructs you, if you find from the evidence that plaintiff has been permanently injured in any degree, by the wrongful act of the defendant complained of in this action, you are to consider such permanent injury in estimating the damages.

" 3. The court instructs the jury that if they believe from the evidence, the plaintiff entitled to damages compensating him for the injuries received, and if they further find from the testimony, that the defendant's conductor, in compelling plaintiff to leave his train, acted in a wanton, reckless, or oppressive manner, then you are at liberty, in addition to such compensatory damages, to award him such further sum as you think right under all the circumstances, as exemplary damages, and in such case, add the same to the amount found for compensation, and the total should be the amount of your verdict, such sum not to exceed the amount claimed in plaintiff's petition."

The court refused the following instructions offered by the defendant : —

" 1. Defendant asks the court to declare the law as follows : That under and by virtue of the contract forming a part of the ticket read in evidence, the plaintiff, as the holder thereof, was only entitled to ride as a passenger in

the cars upon defendant's line, from the city of St. Louis southwardly up to twelve o'clock, P. M., of the twenty-sixth day of February, 1881, notwithstanding said plaintiff may have shown his ticket to the conductor of defendant's train previous to said time on said night.

"2. The court instructs the jury that in this case, plaintiff is only entitled to recover compensation for the injuries inflicted upon him by the alleged wrongful act of defendant, and that the jury, in determining such compensation, will exclude from their consideration speculative or remote damages, or such damages as did not necessarily or naturally flow from the act complained of.

"3. The court instructs the jury that there is no evidence before the jury of any malice upon the part of the conductor, in causing plaintiff to leave defendant's train at the time that he left, and that plaintiff is not entitled to recover herein, exemplary or punitive damages for any injury that he may have received subsequent to his being put off said train."

The court, at the request of the defendant, gave the following instruction : —

"The court declares the law to be, that unless the jury find from the evidence that the conductor of defendant's train, in putting plaintiff off the train on the night of February 26, 1881, was guilty of malice, or a wicked disregard of plaintiff's rights, or of a disposition to oppress the said plaintiff, then the plaintiff is only entitled to recover herein compensation for the injuries actually received by him, and that in determining the amount of damages, they will disregard the remote or speculative damages, or such as did not necessarily or naturally flow from the act of defendant complained of."

These rulings are sufficient to present the questions which we have to consider.

1. The first is, did the ticket expire at midnight so that the plaintiff was rightfully put off the train? We are of opinion that it did not. It will be observed that, by the

terms of the ticket (which differs from ordinary railway tickets, in that it contains a special contract of carriage, the consideration of which is expressed to be that the ticket is issued at a reduced rate), the holder agrees " to *use* the same on or before the expiration of the day as cancelled by punch on the margin," etc.   And the question is, what interpretation is to be put on this clause.   Is the ticket used when it is *presented* to a conductor of the company whose contract it is, at any time before the expiration of the last day on which, by its terms, it may be used, or is it not used until the completion of the entire transit for which it calls ; so that, unless this transit is not completed, according to the company's regular schedule time, until after the expiration of the last day to which it is limited, the passenger can be *then* required to pay further fare, or be ejected from the train?

We are of opinion that such a ticket is used when the holder of it enters upon the transit for which it calls, at any time before midnight of the last day to which it is limited.   Certainly the terms employed in the ticket are not so plain as to leave no room for construction ; and in a case of this kind, where there is room for construction, there is no principle upon which we can be asked to adopt a strict construction as against the travelling public.   The railroad company have sold this ticket, and have got their money for it.   It is not suggested that any hardship or injustice would accrue to them from the adoption of the construction which the plaintiff asks us to put upon its language.   The contrary construction, in this instance, at least, operates as a forfeiture ; and it is certainly a good rule, in construing a doubtful clause in a contract relating to the time within which a given thing is to be done, so to construe the contract as to save a right and prevent a forfeiture.   *Cash* v. *Penix, post*, p. —.   Besides, these tickets, as is well known, are not *personal* contracts with the particular person who first buys them.   On the contrary, they are tokens for the carriage of any person over the transit named, who may

lawfully hold and present them. *Hudson* v. *Kansas Pacific R. Co.*, 9 Fed. Rep. 879. They are bought and sold from hand to hand, like shares of stock, negotiable bonds, and other kinds of scrip. They are, as is well known, sometimes sold in large quantities by the agents of the railroad companies themselves, to brokers, who in turn sell them at a profit to the travelling public. This being so, unless their terms are perfectly clear and unambiguous, they are liable to deceive and work a fraud upon innocent travellers. And that was the case here.

But there is another consideration. The defendant, by its conduct, had placed a construction upon the language in question such as the plaintiff claims for it. If we rightly understand the testimony of the ticket broker who sold this ticket to the plaintiff, he swears of his own knowledge that the defendant company was in the habit of honoring tickets of this kind, that is, tickets which are so punched that the transit cannot be completed before the time when they expire; and he is not contradicted on this point.

We have been favored with a manuscript opinion of the court of common pleas of New York City, in which the precise point here under discussion, upon a ticket precisely like this one, was decided, and decided in favor of the position taken by the defendant in this controversy.

Although this is a very respectable court, and although three judges concurred in this opinion, we cannot assent to it, for the reasons stated. Notwithstanding the reasoning of the court in that case, and the weight which is to be attached to the opinion of those judges, we cannot bring our minds to the conclusion that where the language of a ticket is susceptible of two constructions, that construction should be adopted which will allow the railway company to keep the passage-money which the ticket represents, and at the same time eject the passenger from its train.*

* NOTE. — The case above referred to, *Auerbach* v. *New York, etc., R. Co.*, was reversed by the New York Court of Appeals, since the rendering of this decision, 14 Cent. L. J., 461; *Ibid.* 481.

We were impressed with an analogy drawn by the learned counsel for the plaintiff in his argument of this case. Suppose the Post-Office Department were to determine to retire all postage stamps of a certain print, and should notify the public that such stamps could not be used after a certain day. Would any person doubt that a letter mailed with such a stamp at any time before the closing of the mails on the day named, would go to its destination, although the transit might take a week or more? Certainly not; and why should a different rule be applied to this case?

2. The next question is, whether the court erred in permitting the plaintiff to prove that, after being put off the train, and while walking along the track toward the next station, he received an injury by falling through a cattle-guard. Was this such an injury as might reasonably be expected to flow from the act of putting the plaintiff off the train at the time and place, and under the circumstances shown by his testimony? Was this damage a proximate or remote consequence of the wrong of putting him off the train?

Taking the plaintiff's testimony as the basis of this inquiry, as we are entitled to do after a verdict in his favor, we must remember that it was a very dark and rainy night in the winter; that the station was a flag station merely; that the plaintiff was totally unacquainted with the country; that the only man he was able to speak to refused to take him to his house, but told him that he could get shelter at Arcadia, a mile and a half distant; that he took the most direct and safe way of getting there — the railway track; and, while so endeavoring to get there, fell through the cattle-guard and was injured. A traveller put off at such a place, and at such a time, would be most likely to do what the plaintiff did do; and it is not, we think, straining any legal principle to hold that the hurt which he received was the proximate consequence of the wrong of putting him off the train under the circumstances. There is some analogy n this case to the case of *Patton* v. *Railroad Company* ( 32

Wis. 524). There an aged woman left a railway train in the night-time at a station which was neither open nor lighted, and where there was no one to give her information as to where she might obtain shelter. She wandered away from the depot in search of the highway, and, *returning about an hour afterwards*, fell down a flight of steps upon the premises, and was injured. It was held to be a question for the jury, whether it was negligence in the railway company to have no light at the depot, and no person there to give information, and, if so, whether this negligence was the proximate cause of her injury; both of which questions were answered in the affirmative.

This case is clearly distinguishable from cases where the passenger, wrongfully set down by a carrier at a place other than his destination, chooses to walk to his destination, instead of hiring another conveyance, which he might easily do, and, in consequence of so walking, takes cold and gets sick. In such cases the passenger cannot recover enhanced damages for the sickness, because a person cannot make another pay damages for an injury which he has voluntarily brought upon himself. *Indianapolis R. Co.* v. *Birney,* 71 Ill. 391; *Francis* v. *Transfer Co.*, 5 Mo. App. 7. We regret to find a modern decision of the English Court of Queen's Bench somewhat opposed to us in this view. *Hobbs* v. *Railroad Co.*, L. R. 10 Q. B. 111; *s. c.* 44 L. J. (Q. B.) 49. In that case, a husband and wife, passengers on a railway train, were taken to the wrong station and there put off, through the negligence of the carrier's servants. They could obtain neither accommodation nor conveyance, and consequently were obliged to walk several miles in the middle of a wet night, in consequence of which the wife caught cold and was sick for some time. It was held that they could recover for the personal inconvenience which they both had suffered, but nothing for the wife's illness. An examination of the opinions of the judges will show that the ground on which they proceeded was that the

plaintiffs were only entitled to recover such damages as might reasonably be supposed to have been in the contemplation of the parties *at the time of the making of the contract.* That unquestionably is the correct rule by which to determine the measure of damages for breaches of contracts; but I could never feel satisfied with the application there made of it. In case of the *mere* breach of such a contract — the refusal to perform it at all — this would no doubt be the correct rule; but it is not so when to the breach of the contract there is added the element of a tort, springing out of the breach of a public duty as carrier and a trespass upon the person of the passenger. That case is quite distinguishable upon this ground from this. In that case the act was mere negligence in the carrier's servants in inadvertently carrying the passenger to a wrong destination. Here there was something more than a mere negligent breach of contract, — there was a positive and intentional misfeasance committed by the carrier's servant upon this passenger. This passenger, on the vehicle of a public carrier, where, by the terms of his contract with the carrier, he had a right to be, was forcibly ejected by the carrier's conductor under circumstances of more than ordinary hardship and oppression. His cause of action does not arise *ex contractu* merely; it is an action for a tort, as well, founded upon the breach of a public duty by a public carrier. *New Orleans, etc., R. Co.* v. *Hurst,* 36 Miss. 660. And hence the measure of his damages is not what might reasonably be supposed to have been in the contemplation of the parties at the time when the contract of carriage was made, — that is, when the ticket was sold by the carrier, — but rather what this conductor might reasonably have expected to flow from his wrongful act of putting this man off at that place, at that time of night, in that storm.

The question, it must be admitted, is not entirely clear. The judge could not say, as matter of law, upon the facts of this case, that the particular damage was or was not too

remote; and for this reason, the question was properly left to be solved by the jury.

3. The only other substantial objection made by the defendant's counsel to the rulings of the court, relates to the instruction given at the request of the plaintiff, on the subject of exemplary damages. The learned judge told the jury that if they should find from the testimony that the defendant's conductor, in compelling the plaintiff to leave his train, acted in a wanton, reckless, or oppressive manner, then they might give exemplary damages, etc. The objection to this is, that there was no evidence from which the jury could properly infer that the conductor acted in a wanton, reckless, or oppressive manner. If the language of the instruction is to be construed as referring only to the words used and the means employed by the conductor in ejecting the plaintiff from the train, then perhaps this is so. But we think it was not intended to be understood, and was not understood by the jury, in so narrow a sense. We think it rather told the jury that if they should find that the act of the conductor in putting the plaintiff off the train, under the circumstances, was wanton, reckless, or oppressive, they might give exemplary damages. In this sense, the instruction is certainly free from any objection. If there is any case where it is clear that exemplary damages may be given, it is where a passenger who is lawfully entitled to stay and ride upon a railway train, is put off at a flag station in the middle of the night, in the midst of a wintry storm, a distance of eighty miles from his point of starting, and of two hundred and fifty miles from the point to which he is entitled to ride on the train. There is no difficulty about permitting a jury to say whether the fact of expelling a passenger under such circumstances, is wanton, reckless, or oppressive. It is the frequent practice of courts to allow juries to give exemplary damages in cases where passengers are wrongfully expelled from the vehicles of public carriers. *Graham* v. *Railroad Co.*,

66 Mo. 536; *New Orleans, etc., R. Co. v. Hurst*, 36 Miss. 660. See also *Chicago, etc., R. Co. v. Williams*, 55 Ill. 185.

I recall a case in the United States Circuit Court in this city, the intervening petition of McAuley in the case of *Littlefield v. Atlantic and Pacific Railroad Company*, where a very humane and experienced judge had this question before him as a chancellor. An old man had been put off a passenger train in the daytime, by an honest mistake of the conductor, in supposing that his ticket had expired, when, in fact, it had not. The conductor used no unnecessary violence and no abusive language. It was a bright day, and the old man walked to his home, about three miles distant, without suffering any injury or any very great inconvenience. Treat, J., upon a careful consideration, held it a case for exemplary damages; and, the road being in the hands of a receiver of his court, awarded the petitioner the sum of $500, double the amount awarded in this case, and required the receiver to pay it.

There was, for these reasons, no error in refusing the defendant's second and third instructions on the same subject.

The judgment of the circuit court is affirmed. Judge BAKEWELL concurs; Judge LEWIS is absent.